(Nos. 75-CC-0645, 75-CC-0646, 75-CC-0647, 75-CC-0648 —

DONALD D. LITWILLER and GERALD R. SMITH d/b/a LAKEVIEW REALTY, a partnership, and LAKEVIEW DEVELOPERS, INC., RAY H. LEACH, d/b/a GEORGE'S and LEON K. STEVENSON, d/b/a STEVENSON'S, Claimants, *v.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 15, 1978.*

LEIKEN, LEIKEN & LEIKEN, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; COSTIGAN & WALLRAB, for Respondent.

PER CURIAM.

These four cases were consolidated for hearing since the claims all arose out of the same set of facts and differ only as to the measure of damages. The Court wants to comment on the efficient, thorough and helpful manner in which the parties briefed and argued their respective sides. We feel they are entitled to be so complimented as it represents a thorough presentation of what the evidence tended to prove and what the law seems to be.

Complainants all suffered damages as a result of flood waters entering premises owned by them in Lakeview Shopping Center, south of Eureka, Illinois, on June 20 and 21, 1974.

Sometime prior to August, 1973, the State of Illinois in the process of making repairs to Route #117 decided to replace an old bridge which spanned Walnut Creek approximately 50 feet north of the intersection of Eureka Lake Road and Illinois Route #117 near Eureka, Illinois. Walnut Creek ran from West to East and passed under a bridge on Route #117. The old bridge was built on a storm frequency plan of 25 years, and the new bridge was designed on a storm frequency plan of 50 years. In order to handle traffic during construction, a runaround was designed by the State, construction of which started in August of 1973 and was completed in October, 1973. The runaround was approxmately 600 feet long and was located to the west of Route #117. Its height was the same as that of the surface of the old bridge and of Route #117. The runaround consisted of an earthen embankment with three nine foot diameter culverts underneath. It was designed for use from 12 to 18 months and was built on a five year storm frequency plan.

Lakeview Shopping Center was in existence since 1971 and is located to the southwest of the intersection of Lake Road and Illinois Route #117. Lakeview Shopping Center consisted of two buildings which housed Lakeview Realty, George's Restaurant, and Stevenson's Furniture Store. Under construction at the time of the flood were two additional buildings totaling 15,000 square feet.

In June of 1974 heavy rains saturated the Eureka area. On June 21, Walnut Creek began to overflow its

banks to the North and the water level rose above the height of the three culverts in the runaround. After additional rain on June 22, the water level again rose above the culverts and eventually flowed over the top of the runaround. Water was backed up and diverted to the South across Lake Road reaching the buildings of Lakeview Shopping Center. On Saturday, June 22, 1974, water entered the buildings to the extent that Lakeview Realty had 12 inches of water in its basement and Stevenson's Furniture Store had 4 inches of water on its main floor.

Complainants first argue that the State is liable on a theory of absolute liability because it changed the natural flow of water in Walnut Creek and this resulted in flooding of Claimant's premises causing damage, citing for authority, *Toledo, Wabash & Western Railway Co. v. James C. Morrison, 71 Ill. 616; Ohio & Mississippi Railway Co. v. Charles Thillman, 143 Ill. 127.*

In summary, Claimants urge on this point, "It is the Claimant's position that regardless of the care and skill of the State in design and construction of the runaround, it was in fact insufficient and therefore amounted to a public taking without compensation."

But then they insert the element of foreseeability as they argue, "The only limitation on the liability of the State is in the unforeseeability of the rainfall if it was to be such that it could not have been anticipated."

In so asserting, they support their contention with a quote from *Thillman,* supra:

The Court in *Thillman* said on *page 137:*

"If, in the case of an obstruction of a public river, it appears that the injury resulting therefrom arose from causes which might have been foreseen such as ordinary periodical freshets, he whose superstructure is the immediate cause of the mischief, is liable for the damage. On the other hand, if the injury is occasioned by an act of providence which could not

have been anticipated, no person can be liable."

And on *page 138:*

"The degree of care, which a party is bound to use in constructing a dam across a stream ... must be in proportion to the extent of the injury which will be likely to result to third persons provided it should be insufficient; and it is not enough that the dam is sufficient to resist ordinary floods; for if the stream is occasionally subject to great freshets, those must likewise be guarded against; and the measure of care required must be that which a discreet person would use if the whole risk were his own ... The dam should be sufficient to resist not merely ordinary floods, but such extraordinary floods as may reasonably be anticipated."

In addition to the absolute liability theory, Claimants argue the State was negligent in not designing a temporary bridge with a greater storm frequency than five years, in failing to provide for any emergency spillway if the design was insufficient, and in failing to cut the road when the high waters occurred.

In response the State contends that there is no absolute liability and that the only duty the State had was to refrain from being negligent. They argue the duty was to provide an opening for the natural flow of waters sufficient to afford an outlet for all waters that might reasonably be expected to flow and "to accommodate such freshets and usual and ordinary floods as might reasonably be expected," citing *78 Am Jur 2d Waters, Sec. 28 p. 472-473*. They too refer to *Thillman* and contend that the case requires proof of negligence.

At the hearing, movies and slides were introduced in evidence to show the flooding and also the size and structure of the runaround.

On the question of liability based on negligence, three civil engineers testified, one for Claimants and two for Respondent. Paul J. Schweickert, a civil engineer who had done prior work for Claimants contended the design of the runaround was insufficient. He noted from an exhibit in evidence that the old bridge pro-

vided 640 square feet of opening and this was to be enlarged to 1080 square feet in order to qualify as a 50 year storm frequency plan. The three culverts in the runaround provided only 188 square feet of opening. He concluded it was a mistake not to provide an emergency spillway for overflow if the culverts were to be on a storm frequency of five years, or the road itself should have been made lower. He testified that Lake Road was lower at its lowest point than the temporary runaround, 445.66 siting for Lake Road compared to 448.20 for the temporary runaround. The evidence indicated that the difference in level between water on the west side of the road and the east side of the road was around five feet. He concluded that since the shopping center was close, and if the State wanted to stay with a five year storm design, they shoud have made provisions for an emergency such as the one that occurred.

Steven Magelli, a civil engineer, testified for the State, as the resident engineer on the job and testified that a cut in the road to alleviate the flooding would not have been feasible since the whole road would probably have washed away and damage downstream could have occurred due to the onrush of the waters.

Wayne Kasja, a civil engineer in the employ of the State for 18 years as a project design engineer, testified for the Respondent. He said that in designing the runaround he had to consider the speed and safety of the traffic to be accommodated, the hydraulic requirements, the length of time the runaround was to be in effect, also the geometrics, grade and so on. Relative to the hydraulics, he said it was determined that a five year storm frequency would be adequate. This was based partly on information from the Illinois State Water Survey of precipitation in five communities in the general proximity of the site. Charts and tables

were in evidence to substantiate the data. The drainage area of the creek was about 51 square miles. Mr. Kasja said that "Based on the configuration of the channel as it existed . . . 108 inch diameter metal pipes were proposed to serve the drainage," and that the runaround was to be in place only 12 to 18 months. He indicated that to accommodate a 25 year storm frequency ten such tubes would be necessary; that it would be too costly and that it wasn't practical to put in ten tubes due to the proximity of the runaround to the new bridge. This would have required a channel shape that would not be conducive to construction of the new bridge. He further stated that the road would have to be three feet lower to allow for any significant volume flow and to do this would create a safety hazard to traffic.

With reference to the rain he testified that seven inches fell in three days and this amounted to a 25 year frequency and this, when considered with prior rains in June, would result in even a higher frequency. However, petitioners argue that the storm, when analyzed from the tables for June, 1974, computed by the Illinois State Water Survey from data at five nearby stations, clearly indicated it was of an eight year frequency.

When asked about the situation if the old bridge were in existence he stated that "considering the elevation of the Lakeview Road, it was our opinion that the Lakeview Road and portions of the lot area out there would have received water with the old facility in place."

He did admit, however, that three additional pipes of nine foot diameter could have been installed.

In determining the rule of law to follow in arriving at the State's duty in designing the temporary road we

have reviewed the cases cited and have concluded that the duty is not one of absolute liability in all events but is judged on foreseeability. This is apparent from *Tillman, supra,* when the Court said, "Whether the flood causing the injury is such as one as should have been anticipated and provided against, is a question of fact for the jury to decide." Foreseeability connotes negligence.

In *Ohio & Mississippi Railway Co., supra* the Court said on *page 13,* "The question, then, is not whether appellant has sufficiently provided for an escape of the water of ordinary floods but has it provided for escape of such unusual or extraordinary floods as it should have anticipated would occasionally occur in the future."

Also in *Drada v. Illinois Terminal Railroad Co., 210 Ill. App. 640,* the Court said on *page 648:*

"...it was appellant's duty to provide ample outlets for the water of such floods or freshets as men of ordinary prudence would have foreseen but not against such extraordinary floods as could not have been reasonably anticipated."

There are cases, however, where the language implies an absolute duty without the Court so holding. See *Chic. Milw. & St. Paul Ry Co. v. Carpenter, 125 Ill. App. 306; Strange v. C.C.C. & St. Louis Railway Co., 245 Ill. 246; and also Toledo, Wabash & Western Railway Co. v. James C. Morrison, 71 Ill. 616.*

In reviewing the evidence we note the following important factors in this case:

Lake Road was over two feet lower in at least one place, than the temporary runaround and this was known to the engineers of the State before designing;

Three additional culverts could have been installed with only the cost as an obstacle and such costs

would have been within a reasonable range, considering the risk factor; also there was evidence that larger culverts could have been used;

The closeness of the Shopping Center (300 feet) to the creek and probable damage if flooding occurred;

The drastic reduction of the open space of the old bridge compared with the three culverts in the runaround was from 640 square feet for the old bridge, to 188 square feet for the culverts;

The floor of Lakeview Realty was slightly higher than the temporary road but nevertheless flooded;

Walnut Creek drained 51 square miles of land;

No emergency plan was included in the design of the runaround to accommodate any excess waters if the State miscalculated the rainfall expectancy;

There was undisputed evidence by witnesses who lived there for over 15 years that there had never been any flooding to the south of Lake Road, while there had been to the north of Walnut Creek;

On the other hand, it does appear that the rainfall in the area was unusual and extraordinary.

If this were a jury case, the question would actually be one for it to decide, as reasonable minds would differ on the extent of the State's duty.

The State may not have acted unreasonably in designing the temporary bridge, and we cannot say, as a matter of law, it should have guaranteed in all events that there would be no flooding of Claimants' property. On the whole, however, we feel that it is more probably true than not that the State should have so designed the runaround with an emergency spillway or with additional capacity to protect against flooding of

Claimants' property. If it chose not to do so because of cost factors, or as a concession to safety, then the risk of so doing must be on the State. This may have been a risk it was willing to take, for to insist on a complete flood proof design in every case, over the long run, might be unwise from a road development standpoint. But having gambled and lost, we feel they should pay for the loss under the facts of this case.

The facts presented in this case to measure the conduct of the State against the requirement of freedom from negligence are close. Holding for Claimants compels the factual conclusion, by a preponderance of the evidence, that the State failed to do all that was reasonable under the circumstances, and that it should have foreseen that such failure could have permitted heavy rains to flood Claimants' premises.

The damages claimed and the amounts allowed are shown below. There was no testimony supporting the dollar amount of damage sustained by Ray H. Leach, one of the Claimants. At the hearing he failed to testify.

Our allowances are based on an analysis of the evidence submitted in support of the items claimed. When an item is disallowed, it is our judgment that the proof fails to sustain it or that other factors affected the amount of damage or that the proof submitted was not specific enough to be convincing as to dollar amount, and was thereore speculative in amount.

It is ordered that awards are made as follows:

Lakeview Realty is awarded the sum of $3,059.74.
Lakeview Developers is awarded the sum of $7,826.85.
Stevenson's is awarded the sum of $17,621.40.
George's is not awarded.

(An itemized breakdown of awards has been deleted. Ed.)